United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL E. SPENCER,

               Petitioner,

  vs.

 RICHARD KIRKLAND, Warden,

              Respondent.

_____/

No. C 05-4338 PJH (PR)

**ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS**

      This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §
2254.  The court ordered respondent to show cause why the writ should not be granted.
Respondent has filed an answer and a memorandum of points and authorities in support of
it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  For
the reasons set out below, the petition will be denied.

## BACKGROUND

      Petitioner was convicted by an Alameda County jury of three counts of second
degree robbery, *see* Cal. Penal Code § 211, and one count of being a felon in possession
of a firearm, *see id.* § 12021(a).  He was sentenced to prison for 121 years to life.  He
unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme
Court of California denied review.  Petitioner reports that he did not file any state habeas
petitions.

      He  does not dispute the following facts, which are excerpted from the opinion of the
California Court of Appeal:

      The charges arose from three commercial robberies committed during 1999.
The first was a robbery of a 7-Eleven store on Piedmont Avenue in Oakland on
May 31, 1999.  The clerk, Anthony Stapert, saw a heavyset African-American

**United States District Court**
For the Northern District of California

male enter the store, followed by [petitioner]. [Petitioner] was wearing a red "beanie" cap and dark clothing. He asked Stapert about milk and bread, retrieved some milk from the refrigerator, and returned to the checkout counter where Stapert was standing. He pointed a gun at Stapert and demanded money, stating, "Give me the money now motherfucker and I'm not playing." As Stapert opened a cash register and handed [petitioner] money, [petitioner] moved to the side. When Stapert opened the other register and reached for the money in it, [petitioner] put the gun to Stapert's head and reached into the register himself. He told Stapert to lie on the ground and count to 10. Stapert looked up and saw [petitioner] heading toward MacArthur Avenue. A store security camera videotaped the robbery.

Stapert indicated that he made a point of looking at the robber and described him (in his call to 911) as an African-American male in his 40's. When interviewed by police, Stapert further described the robber as five feet eight inches tall and weighing 130 pounds, wearing a red beanie. Stapert viewed a live lineup on August 9, 1999, and indicated that [petitioner] looked like the robber and he felt strongly that he was, but he did not want to rule out the possibility that the robber had a twin brother. At the first preliminary hearing he told the court the same thing; other than that, he indicated he was strongly convinced that [petitioner] was the robber. At the second preliminary hearing, [F/n 5. As the case was dismissed after the first information was filed, and a new complaint filed, two preliminary hearings were held.] Stapert testified that he was 65 to 70 percent sure that [petitioner] was the person who robbed him before he viewed the videotape. After viewing it, he was 100 percent certain. He indicated that had he watched the videotape before attending the physical lineup, he would have placed an "X" by [petitioner's] name. He was merely being "prudent" when he placed a question mark by it.

The second robbery occurred at the Global Exchange in Berkeley on June 21, 1999. The store manager, Carolyn Gravely, was working alone when [petitioner] entered. He was wearing a green baseball cap and sunglasses. He was very nervous and looked around the store. Even though it was the day after Father's Day, [petitioner] indicated that he was looking for a Father's Day card. He picked out a card and Gravely rang up the purchase. Gravely noticed a green object that [petitioner] was holding under his jacket; she believed it was a gun. [Petitioner] told Gravely to empty the register; she complied and gave him $120 from the register and an additional $25 to $30 from her wallet. [Petitioner] said he was desperate and had nothing to lose. He told Gravely to lie down on the floor. She complied. About two minutes later she got up and called the police. She described the robber as a clean shaven African-American man, 35 to 40 years old, with a small build, wearing dark clothes, a green baseball cap, and sunglasses. She did not recall the robber having freckles or marks on his skin and was unable to see his skin tone. She could not see his eyes behind the sunglasses he was wearing.

Gravely told the police that she felt she could identify the robber and was shown a photo lineup, which did not include [petitioner]. She indicated that one person in the lineup resembled or bore a good resemblance to the robber, but she was not sure. During a live lineup on August 9, 1999, she positively identified [petitioner] as the robber. She indicated in one court appearance that when she identified [petitioner] in court and at the physical lineup, she thought he was the same individual depicted in the photo lineup.

United States District Court

For the Northern District of California

1
2
3
4
5

The third robbery occurred on July 7, 1999, at the Talisman Antiques store on College Avenue in Oakland. [Petitioner] entered the store and asked store owner Cheryl Ireland-Hooper if she had jewelry, even though he was standing next to the jewelry counter. [Petitioner] was standing two to three feet away from Ireland-Hooper, wearing a baseball cap, dark navy blue or gray light plaid jacket, and sunglasses. At trial she testified that the cap was green and indicated that the baseball cap seized when [petitioner] was arrested was in fact the hat the robber had been wearing. [F/n 6. In her statements to the police, she indicated the cap was "dark" and described the shirt as cream colored.]

6
7
8
9
10

At that point, [petitioner] was within a foot of Ireland-Hooper. He told her to open the cash register; she explained that the store did not have a cash register and opened the jewelry case. [Petitioner] told Ireland-Hooper to move to the back of the store and that he would blow her "fucking brains out" if she did not. He put an object in her hair, grabbed her hair, and pushed her into the back room. Ireland-Hooper handed [petitioner] a wallet containing $30. [Petitioner] was screaming and Ireland-Hooper retrieved another wallet from her purse and gave it to him as well. [Petitioner] pushed Ireland-Hooper out of the back door of the store and threw a folded metal chair at her.

11
12
13
14
15
16
17

About a minute later, Ireland-Hooper turned around and [petitioner] was gone. The police arrived about 10 minutes later. Ireland-Hooper described the robber as a clean-shaven African-American man, 30 to 35 years of age, medium build, between five feet seven inches and five feet nine inches tall, weighing 150 pounds, having a mottled complexion, and wearing dark gray pants, a plaid button-down shirt, and a green baseball cap. Sometime after the robbery, Ireland-Hooper read two articles in the newspaper about the robberies, which included a description of the robber. The police showed Ireland-Hooper a composite sketch of a suspect in the robberies, which Ireland-Hooper said was a reasonable likeness of the perpetrator. On August 9, 1999, Ireland-Hooper attended a live lineup and identified [petitioner] as the robber. She immediately recognized him as the person who robbed her.

18
19

The house where [petitioner] was arrested was searched and two knit caps (one black and one red), a green baseball cap, and two green plaid shirts were recovered. Indicia indicated that [petitioner] resided at the residence.

20
21
22
23
24
25

[Petitioner] called several witnesses at trial. Duane Drew, a friend of [petitioner], indicated that during the summer of 1999 he saw [petitioner] without a beard, but never without a mustache. Although he was with [petitioner] on May 29 and 30, 1999, he dropped [petitioner] off at 6 p.m. on May 31 and was not with him when the 7-Eleven robbery occurred the following day. [Petitioner] also introduced evidence that he was employed during the summer of 1999 and that his net pay was about $1,280. Beth Lorey testified that she saw a person who resembled [petitioner] on the afternoon of July 7, 1999. He ran quickly in front of her car. She gave a statement to the police shortly after the Talisman Antiques robbery. Finally, the defense called an eyewitness identification expert who described problems with eyewitness identifications and issues impacting their accuracy.

26
27

In rebuttal, the prosecution called Thomas Brobst, who testified that he saw [petitioner] four or five times between March and August of 1999. [Petitioner] had no mustache and was clean-shaven. Brobst remembered that [petitioner] shaved off his mustache on April 18, 1999.

28

Ex. 3 (Unpublished Opinion of the California Court of Appeal, First Appellate District,

1    *People v. Spencer*, No. A098944 (June 29, 2004)) at 3-6.[1]

2    **STANDARD OF REVIEW**

3       A district court may not grant a petition challenging a state conviction or sentence on

4 the basis of a claim that was reviewed on the merits in state court unless the state court's

5 adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

6 unreasonable application of, clearly established Federal law, as determined by the

7 Supreme Court of the United States; or (2) resulted in a decision that was based on an

8 unreasonable determination of the facts in light of the evidence presented in the State court

9 proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to

10 mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000),

11 while the second prong applies to decisions based on factual determinations, *Miller-El v.*

12 *Cockrell*, 537 U.S. 322, 340 (2003).

13       A state court decision is "contrary to" Supreme Court authority, that is, falls under the

14 first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

15 reached by [the Supreme] Court on a question of law or if the state court decides a case

16 differently than [the Supreme] Court has on a set of materially indistinguishable facts."

17 *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application

18 of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

19 identifies the governing legal principle from the Supreme Court's decisions but

20 "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

21 federal court on habeas review may not issue the writ "simply because that court concludes

22 in its independent judgment that the relevant state-court decision applied clearly

23 established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must

24 be "objectively unreasonable" to support granting the writ. *Id.* at 409.

25       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

26 determination will not be overturned on factual grounds unless objectively unreasonable in

27

28      [1] Citations to "Ex." hereafter are to the record lodged by respondent.

4

1  light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at

2  340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

3      When there is no reasoned opinion from the highest state court to consider the

4  petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

5  501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th

6  Cir.2000).

7                              **DISCUSSION**

8      As grounds for habeas relief petitioner asserts that:  (1) The trial court's imposition of

9  a sentence enhancement for use of a firearm duplicated the sentence for being a felon in

10  possession of a firearm, a violation of section 654 of the California Penal Code and of

11  petitioner's right to due process as set out in *Blakely v. Washington*, 124 S. Ct. 2531, 2537

12  (2004); (2) his due process rights and right to effective assistance of counsel were violated

13  by the trial court's refusal to substitute new counsel, and the refusal rendered his

14  subsequent waiver of counsel involuntary; (3) his due process and confrontation rights

15  were violated by the magistrate's comments at a preliminary hearing; (4) his due process

16  rights were violated when the court refused to sever the counts; (5) his due process rights

17  were violated by denial of his request to appear in court unshackled or with less obtrusive

18  alternative shackles; and (6) the trial court "erred" when it reconsidered another judge's

19  earlier ruling suppressing evidence.

20  **I.    Sentencing**

21      Petitioner claims that the trial court violated his Sixth Amendment right to a trial by

22  jury when it improperly sentenced him to both a firearm enhancement in the 7-Eleven

23  robbery count and a consecutive term for being a felon in possession of a firearm.

24  Petitioner claims that the imposition of consecutive sentences violates section 654 of the

25  California Penal Code, *Apprendi v. New Jersey*, 530 U.S. 446 (2000), and *Blakely v.*

26  *Washington*, 524 U.S. 296 (2004).

27      At sentencing, the court found that petitioner was convicted by a jury of three

28  robbery counts (counts one, three, and four) and one count of being a felon in possession

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1   of a firearm (count two).  Ex. 2 at 2211.  He was also found to have five prior felony

2   convictions.  *Id.*  The court sentenced him under California Penal Code sections

3   667(e)(2)(A) and 1170.12 (c)(2)(A) ("Three Strikes Law" ) to twenty-five years to life for

4   each count, to be served consecutively.  *Id.* at 2219.  He was also sentenced to a ten year

5   enhancement for using a firearm in the 7-Eleven robbery count (count one), under

6   California Penal Code section 12022(b).  *Id.* at 2219.  Including all priors and

7   enhancements, petitioner was sentenced to 121 years to life.  *Id.* at 2221.  Defense counsel

8   argued that under section 654 of the California Penal Code, petitioner's ten-year

9   enhancement for count one should bar the consecutive sentence for count two because

10  both counts stemmed from the same facts.  *Id.* at 2222.  The court rejected the argument,

11  holding that the sentence should be consecutive because of "the dangerousness of

12  [petitioner] in using a firearm, not only in the commission of the offense but also possession

13  as an ex-felon."  *Id.*

14          The California Court of Appeal rejected petitioner's claim, holding that the sentence

15  did not implicate *Apprendi* or *Blakely*.  Ex. 4 (Order Modifying Op.) at 1-2.  The court held

16  that the jury had found all the facts that were essential to the punishment selected.  *Id.*  It is

17  not entirely clear what the court meant by this statement, but because petitioner's argument

18  was recently rejected by the United States Supreme Court in *Oregon v. Ice*, 129 S.Ct. 711

19  (2009), it does not matter.  The Supreme Court held:  " [I]n light of historical practice and

20  the authority of States over administration of their criminal justice systems, [] the Sixth

21  Amendment does not exclude Oregon's choice [to have judges rather than juries decide

22  facts leading to imposition of consecutive rather than concurrent sentences]."  *Id.* at 714-15.

23  Because the California courts' results on this issue are entirely consistent with Supreme

24  Court law on the matter, the decisions of the California appellate courts were not contrary

25  to, or an unreasonable application of, clearly-established United States Supreme Court

26  authority.

27  ///

28  ///

6

**II.      Substitution of Counsel and Self-Representation**

Petitioner claims that the trial court improperly denied his requests for substitution of counsel because, among other reasons, counsel " repeatedly expressed doubt about whether he could diligently or effectively represent petitioner due to the hostility and conflict in their relationship." Trav. at 5.  He also claims that, due to the court's failure to allow substitution of counsel and his belief that representation by his counsel was like not having an attorney, his decision to represent himself was not voluntary.

The California Court of Appeal summarized the hearings petitioner received under *People v. Marsden*, 2 Cal. 3d 118 (1970) and *Faretta v. California,* 422 U.S. 806 (1975*)*:

> On September 4, 2001, William Daley was substituted in as [petitioner's] appointed counsel. On November 14, 2001, [petitioner] made a [*Faretta*] motion to represent himself, which the court denied as untimely and equivocal.

> On December 26, 2001, the court conducted a *Marsden* hearing on [petitioner's] request to discharge Daley and substitute appointed counsel. Daley also filed a motion to withdraw as counsel. At that hearing, Daley indicated that he intended to declare a conflict. The court inquired about the basis of [petitioner's] *Marsden* motion. [Petitioner] told the court the basis of his motion was inadequate representation because Daley had not "done anything" on the case since his appointment in September 2001. The court asked Daley about his discussion with [petitioner] concerning his readiness for trial. Daley indicated that his preparation in the case had been delayed due to the demands of another trial and that he asked [petitioner] to waive time for trial because he would be more comfortable if he had additional time to prepare. Daley also told [petitioner] that he would ask for a limited continuance if he felt that he was substantially unprepared for trial.

> The court also asked Daley about his conflict with [petitioner]. Daley informed the court that his relationship with [petitioner] had deteriorated to the point that [petitioner] refused to talk to Daley and told Daley not to bother visiting him at the jail. In Daley's opinion, [petitioner] needed a new attorney because the strained attorney-client relationship was going to interfere with Daley's ability to provide a fair and vigorous defense. Daley had the impression that [petitioner] wanted him to provide ineffective representation so that he would have an issue on appeal. Daley reiterated that he did not think he could do a "fair job" for [petitioner]. He indicated that if his motion to withdraw were denied and [petitioner] refused to waive time, he would do his best but had "grave concerns" if his conflicts with [petitioner] could be overcome.

> The trial court reviewed the history of the case, and saw a distinct pattern of [petitioner] making it difficult for defense counsel to represent him in order to get a different attorney. [Petitioner] had previously made multiple *Marsden* and *Faretta* motions and generally made it so difficult for counsel to represent him that the attorneys ultimately would move to withdraw from the case. The court noted that the attorney replaced by Daley had asked to withdraw from the case for reasons "very similar" to those expressed by Daley. The court found that

United States District Court

For the Northern District of California

7

**United States District Court**
For the Northern District of California

while [petitioner] was entitled to effective, conflict-free representation, he was not entitled to sabotage his relationships with his attorneys in order to force them to withdraw, which, in essence, allowed [petitioner] to control who represented him based on his conduct. The court found that Daley's motion to withdraw was the result of [petitioner's] efforts to sabotage his relationship with Daley in order to get a new attorney.

In the court's opinion, Daley was a highly qualified, competent, and "darn good" attorney, and that [petitioner] would have good representation if Daley represented him at trial. The court was also of the opinion that Daley would do his best for [petitioner] regardless of his personal feelings. The court denied the *Marsden* motion and the motion to withdraw.

On January 7, 2002, the court heard another *Marsden* motion by [petitioner] and another motion to withdraw by Daley. At this hearing, [petitioner] informed the court that Daley was not properly representing him. [Petitioner] complained that his attorney (1) had not conferred with him concerning the preparation of his defense; (2) had not communicated with him about his case; (3) had not performed any work on the case, including failing to pursue a suppression motion or a bail motion; (4) refused to secure and present an eyewitness expert for the trial; (5) had not filed any motions, including a motion concerning a bifurcated trial on his priors, a supplemental suppression motion concerning an unreliable confidential informant, and a severance motion; (6) had a conflict with [petitioner], no longer wanted the case, and would not represent [petitioner] to the best of his ability; (7) had waived time without [petitioner's] consent; and (8) was not prepared for trial.

At the court's request, Daley summarized his experience in criminal practice. He had been practicing law since 1972 and had built up his criminal practice over the years. Criminal law had been the predominant focus of his practice for the last 10 to 15 years, including 45 criminal jury trials. He had conducted approximately 200 preliminary examinations. He was qualified to try death penalty cases, and had tried one death penalty case and a dozen homicide cases. He had the equivalent experience of a certified criminal specialist.

Daley also provided explanations regarding his tactical decisions concerning various motions and also explained that he thought eyewitness experts were no longer required in light of the changes to CALJIC instructions. Daley informed the court that his conflict with [petitioner] stemmed from the fact that [petitioner] was a very difficult client. Daley stated that [petitioner's] conduct made it difficult for him to provide [petitioner] with a "full-hearted defense." However, Daley intended to give [petitioner] a full, professional, and ethically-required defense if he remained in the case.

The court found that Daley did not have an actual conflict of interest, but was only expressing normal concerns in a difficult attorney-client relationship. The court further found that Daley could perform his professional and ethical responsibilities. The court ruled that Daley had properly represented [petitioner] up to that point, and would continue to do so. Although the relationship was not pleasant on a personal level, the relationship had not deteriorated to the point that Daley could not adequately represent [petitioner]. Also, while [petitioner] and Daley had not discussed the case as often as [petitioner] wanted, Daley had been working on the case and appreciated the legal and factual issues in it.

///

8

On Monday, January 14, 2002, the court asked Daley about his relationship with [petitioner].  Daley responded that he had a "good conversation" with [petitioner] on the previous Friday, that the investigation was proceeding, and that he and his client had a working relationship at the moment.  Daley believed he could conduct a thoroughly ethical defense for [petitioner].  [Petitioner] disagreed, and told the court that Daley was providing ineffective assistance of counsel.  [Petitioner] made yet another *Marsden* motion to replace Daley as counsel, which the court heard and denied.

At the *Marsden* hearing, [petitioner] again told the court he wanted to fire Daley.  The court asked [petitioner] if anything had changed since the last *Marsden* motion.  [Petitioner] again complained that he had not conferred enough with counsel, he had not seen any new motions, and he did not believe counsel was any more prepared for trial than he was the previous week.  Daley informed the court that in the last week he had met with [petitioner] twice, once with an investigator, and had worked on in limine motions.  He had also researched issues and had read the record.  Daley acknowledged that there were things left to do, but felt he was making good progress.

The court concluded that Daley had made great progress in his preparation for trial, both factually and legally.  Daley had properly represented [petitioner] up to that point, and would continue to do so.  The court found that there had not been an actual breakdown in the professional relationship between attorney and client that prevented Daley from properly representing [petitioner] at trial.

On January 17, 2002, after defense counsel made several motions in limine, [petitioner] made a *Faretta* motion to represent himself.  After admonishing [petitioner] about self-representation, the court granted [petitioner]'s motion.  [Petitioner] represented himself throughout jury selection, until he requested and was granted reappointment of counsel on January 31, 2002.

Ex. 3 at 20-23 (citations omitted).

### a.    Substitution of Counsel

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas.  *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The inquiry for a federal habeas court is whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  *Schell*, 218 F.3d at 1026.

///

9

**United States District Court**
For the Northern District of California

1    Although petitioner claimed that counsel failed to communicate with him, the record

2    shows that counsel made efforts to communicate with him, despite personal differences

3    and other professional commitments.  He discussed the case with petitioner on

4    approximately four to five occasions since taking over the case from another attorney.  Ex.

5    2 at 17, 31, 40.  When counsel tried to see him after counsel's prior trial was over,

6    petitioner told him not to come back.  *Id.* at 17.  Petitioner told counsel he never wanted to

7    see him again and not to bother with him.  *Id.* at 31.

8    Counsel conceded that he didn't have time to discuss the case with petitioner as

9    much as he would have liked while he worked on his prior trial, but stated that he was as

10   prepared as he could be within the time constraints.  *Id.* at 32.  Although counsel didn't

11   discuss the case with petitioner, he continued to work on the case.  He filed a bail motion.

12   *Id.* at 40.  He thought about requesting a severance and investigating expert witnesses.  *Id.*

13   at 42.  He made tactical choices about how to best spend time preparing for the case.  *Id.*

14   After the earlier trial concluded, he discussed motions with petitioner, wrote and filed a

15   severance motion, and sent an investigator to find witnesses.  *Id.* at 85-87.

16   The California Court of Appeal rejected petitioner's claim and found that the trial

17   court property denied the *Marsden* motions because the record did not indicate that he and

18   counsel had become "embroiled in such an irreconcilable conflict that ineffective assistance

19   was likely to result" and because petitioner "cannot simply refuse to cooperate with his

20   appointed counsel and thereby compel the court to remove that attorney."  Ex. 3 at 25.

21   Counsel made the necessary efforts to represent petitioner -- he communicated with

22   petitioner on several occasions, considered important issues in the case, reviewed and

23   prepared motions, and had an investigator talk to potential witnesses.  The trial court

24   stated: "I have confidence in the fact that, although the relationship is – on a personal level

25   may not be a pleasant one, professionally I have confidence that [counsel] will continue to

26   represent [petitioner] professionally and ethically."  Ex. 2 at 50-51.

27   ///

28   The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful

United States District Court

For the Northern District of California

1   relationship" between an accused and his counsel.  *Morris v. Slappy*, 461 U.S. 1, 14

2   (1983).  On one occasion, petitioner and counsel engaged in "volatile conversation" and

3   counsel stormed out.  Ex. 2 at 17.  Petitioner told counsel not to "bother" seeing him.  *Id.* at

4   9.  Counsel expressed concern that his best professional effort would not be enough to

5   overcome the difficulties with petitioner and thought petitioner's behavior would interfere

6   with fair representation.  *Id.* at 8-9.  But he also stated the he could give a "fullhearted"

7   defense.  *Id.* at 37.  Here, the trial court found only that petitioner and his lawyer were not

8   getting along, and a pattern of petitioner's trying to sabotage relationships with his

9   appointed counsel to get a different attorney.  Ex. 2 at 14.  "No Supreme Court case has

10  held that "the Sixth Amendment is violated when a defendant is represented by a lawyer

11  free of actual conflicts of interest, but with whom the defendant refuses to cooperate

12  because of dislike or distrust."  *Larson v. Palmateer,* 515 F.3d 1057, 1067 (9th Cir. 2008)

13  (no relief under AEDPA for defendant who did not argue counsel had either an actual or

14  apparent conflict of interest, and instead complained only about lack of communication with

15  counsel and counsel's strategic decisions, including not making motions defendant

16  requested, contacting witnesses without defendant's consent, and not providing defendant

17  with a defense witness list for his approval) (*quoting Plumlee v. Masto*, 512 F.3d 1204,

18  1211 (9th Cir.) (finding no 6th Amendment violation when defendant is represented by

19  lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate

20  because of dislike or distrust), *cert. denied*, 76 U.S.L.W. 3636 (2008)).

21          The personal conflict here, caused as it was by petitioner's actions and without

22  evidence of a total lack of communication, did not effectively deprive petitioner of counsel.

23  *See Schell*, 218 F.3rd at 1026.  Because petitioner's Sixth Amendment rights were not

24  violated, the state courts' rejections of this claim could not have been contrary to, or an

25  unreasonable application of, clearly-established Supreme Court authority.

26  ///

27  ///

28          **b.       Self-Representation**

11

United States District Court
For the Northern District of California

1    A criminal defendant has a Sixth Amendment right to self-representation. *Faretta*,

2    422 U.S. at 832.  But defendant's decision to represent himself and waive the right to

3    counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of

4    securing delay.  *Id.* at 835; *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994); *Adams v.*

5    *Carroll*, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989).  Before a trial court may allow an

6    accused to exercise the right of self-representation, it must conclude that the accused has

7    "knowingly and intelligently" waived his underlying right to counsel.  *Faretta*, 422 U.S. at

8    835.  Consequently, the Sixth Amendment requires that a state trial court, before letting an

9    accused proceed pro se, be assured that he "is made aware of the dangers and

10   disadvantages of self-representation so the record will establish that 'he knows what he is

11   doing and his choice is made with eyes open.'"  *Snook v. Wood*, 89 F.3d 605, 613 (9th Cir.

12   1996) (quoting *Faretta*, 422 U.S. at 835).

13       Petitioner claims that his wavier of rights in his request to represent himself was

14   involuntary because it was forced upon him by the trial court's failure to grant his *Marsden*

15   motions.  The predicate for this argument has not been established, however, because

16   here the state courts concluded that denial of the *Marsden* motions did not violate state

17   law, and this court has concluded above that the denial of the motions to replace counsel

18   was not unconstitutional.  "'A voluntary decision to waive counsel is not necessarily one

19   that is entirely unconstrained.  A criminal defendant may be asked to choose between

20   waiver and another course of action so long as the choice presented to him is not

21   constitutionally offensive.'"  *United States v. Robinson*, 913 F.2d 712, (9th Cir. 1990)

22   (*quoting United States v. Moya-Gomez*, 860 F.2d 706, 739 (7th Cir.1988)).  Because in this

23   case the choice was not constitutionally offense, this claim is without merit.

24       Because the state courts' rejections of petitioner's claim were not contrary to, or an

25   unreasonable application of, clearly established Supreme Court law, petitioner is not

26   entitled to federal habeas relief on this claim.

27   ///

28   **III.    Magistrate Bias**

United States District Court

For the Northern District of California

1    Petitioner claims that comments by the court during his cross-examination of

2  eyewitness Stapert at the preliminary hearing violated his Confrontation Clause and due

3  process rights.

4    The California Court of Appeal summarized the facts leading to the claim:

5    [Petitioner] represented himself at the preliminary hearing held in February
      2001 [F/n 17.  This was the second preliminary hearing, held after the original
6    information was dismissed and the case was filed anew in lower court.] and
      made a section 1538.5 motion to suppress the identification made at the
7    physical lineup.  The court agreed with the prosecution that [petitioner's]
      motion "opened the door" on the issue of the lineup identification.  The court
8    allowed the prosecution to introduce the lineup identification so that it could
      rule on the suppression motion.
9
      At the preliminary hearing, Stapert testified that he identified [petitioner] at the
10   lineup because he recognized him as the man at the 7-Eleven.  He testified
      that he "got a good enough look" at the robber to point him out at the lineup
11   and to identify him in court.  On cross-examination, [petitioner] asked Stapert
      several questions about his identification of [petitioner] at the lineup.  The
12   magistrate interrupted [petitioner] to say, "Mr. Spencer, I think I should share
      something with you, . . . you had a motion to suppress the testimony on a
13   lineup and you're introducing all the lineup testimony.  The D.A. hasn't offered
      any lineup testimony.  Do you realize by your offering it, you blow your 1538
14   [as to this witness]?"  When [petitioner] complained that the magistrate had
      made a prejudgment without hearing the motion, the court responded, "I'm
15   just telling you what you accomplished with your cross-examination. . .
      Making you aware of it so you don't make the same mistake, Mr. Spencer . . .
16   It was meant to help you.  Forget it."  When [petitioner] began to respond, the
      magistrate interrupted, telling [petitioner], "I want you to think about this for a
17   moment.  I could identify you at that robbery by one look at the tape."
      [Petitioner] again complained that the court had made a prejudgment, to
18   which the court responded, "I didn't prejudge it.  I saw the tape and saw you
      in it, man."  [Petitioner] then complained that the court had stated on the
19   record that he was guilty and that the court could identify him.  The court
      responded, "Justice is blind.  I wear glasses and I could see you on that tape,
20   Mr. Spencer."

21   At the end of Stapert's cross-examination, [petitioner] tried to get the witness
      to admit that he was not sure of his identification.  Stapert responded, "Well,
22   what saves my case is that, like the judge said, you're on the tape and I
      believe that I chose you from the lineup.  I recognized you here today.  I
23   recognized you six or seven months ago."

24  Ex 3 at 14-15.

25    The California Court of Appeal emphasized that the court's comments occurred at a

26  preliminary hearing and not before a jury, and that the witness had identified petitioner in

27  the lineup and in court before the court's comments.  Ex. 3 at 16.  It rejected petitioner's

28  claim, stating that the court was merely commenting on the evidence and not pronouncing

13

United States District Court

For the Northern District of California

1    petitioner's guilt.  *Id.*

2    It is not clear that there is a viable confrontation claim here at all, but from

3    petitioner's arguments it appears his objection is to the court's interference with his pro-se

4    conduct of cross-examination.  The court's comments were not made in front of the jury,

5    nor did the magistrate preside at the trial.  *See* Ex. 3 at 105.  Stapert's testimony reflects

6    that the video tape, and not the court's comments, influenced his confidence in the

7    identification.  *Id.* at 109.  Assuming for purposes of this ruling that the Confrontation

8    Clause applies at a preliminary hearing, it guarantees an opportunity for effective cross-

9    examination, not cross-examination that is effective in whatever way, and to whatever

10   extent, the defense might wish.  *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per

11   curiam).  The court here did not prevent petitioner from conducting effective cross-

12   examination; if it was ineffective, it was for reasons other than the court's involvement.

13   There was no violation of the Confrontation Clause.  *See Stincer*, 482 U.S. at 739.

14   Further, assuming a violation of the Confrontation Clause, the violation could not

15   have had an actual and prejudicial effect upon the jury.  *See Hernandez v. Small*, 282 F.3d

16   1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

17   Irrespective of any influence the court's comments may have had on Stapert's testimony,

18   the jury was shown the tape of the robbery to make their own independent determination of

19   whether petitioner was the person who robbed the store.  Petitioner fails to show that the

20   magistrate's comments had any effect on the jury and therefore was not prejudiced.  *See*

21   *Hernandez*, 282 F.3d at 1144.

22   Petitioner also contends that the magistrate's comments violated his due process

23   rights, presumably his right to an unbiased judge.  The Due Process Clause guarantees a

24   criminal defendant the right to a fair and impartial judge.  *See In re Murchison*, 349 U.S.

25   133, 136 (1955).  The magistrate here was commenting on the evidence he had seen, with

26   no jury present and no decision-maker to be influenced by his comments; there is no

27   evidence that he was not impartial.  There was no due process violation.

28   The state court's decision was not contrary to, or an unreasonable application of,

14

1    clearly established Supreme Court precedent, or was based on an unreasonable

2    determination of the facts.  *See* 28 U.S.C. § 2254(d)**.**

3    **IV.    Severance**

4        Petitioner claims that the trial court's denial of his motion to sever the count of

5    second-degree robbery relating to the 7-Eleven store from the other two robbery counts

6    violated his due process right to a fair trial.  He claims, specifically, that the denial of the

7    motion to sever was prejudicial because the evidence was not cross-admissible -- the only

8    thing the robberies had in common was the purchasing of an item in the store before the

9    robbery occurred.  He also claims that the evidence of the first charge was much stronger,

10   which led to a  "spillover" of evidence to convict him of the other counts.

11       The question presented in federal habeas review of a trial court's denial of

12   severance is whether the state proceedings satisfied due process.  *Grimsby v. Blodgett*,

13   130 F.3d 365, 370 (9th Cir. 1997).  To prevail, therefore, the petitioner must demonstrate

14   that the state court's denial of severance resulted in prejudice great enough to render his

15   trial fundamentally unfair.  *Id.*  In addition, the impermissible joinder must have had a

16   substantial and injurious effect or influence in determining the jury's verdict.  *Sandoval v.*

17   *Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).  In evaluating prejudice, the court focuses

18   particularly on cross-admissibility of evidence and the danger of "spillover" from one charge

19   to another, especially where one charge or set of charges is weaker than another.  *Davis v.*

20   *Woodford*, 333 F.3d 982 (9th Cir. 2003).

21       The California Court of Appeal rejected petitioner's claim, finding that "evidence of

22   the 7-Eleven robbery would likely have been cross-admissible in a separate trial of the

23   other robbery counts, under the common design or plan theory of admissibility . . . the trial

24   court relied upon the similarity of the crimes as the basis for its ruling that severance would

25   be denied." Ex. 3 at 18. The court also rejected the claim that substantial prejudice

26   resulted from the denial of severance, finding that all the charges "appear to be strong."  *Id.*

27   at 19.

28       The trial court's denial of the severance motion did not deny petitioner his due

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    process right to a fair trial.  First, the evidence of each crime was cross-admissible under a

2    common plan theory of admissibility.  In each of the three robberies, petitioner asked the

3    clerk about a specific item before robbing the store.  In the 7-Eleven robbery, he used a

4    firearm and in the other robberies, he simulated using a firearm.  In the Talisman Antiques

5    robbery, he simulated a firearm and threatened to shoot the clerk.  Because the common

6    features help support the inference of a common plan, the evidence in the three robberies

7    were cross-admissible.  *See People v. Kraft*, 5 P.3d 68, 99 (Cal. 2000) ("'To establish the

8    existence of a common design or plan, the common features must indicate the existence of

9    a plan rather than a series of similar spontaneous acts . . . the plan need not be unusual or

10   distinctive; it need only exist to support the inference that defendant employed that plan in

11   committing the charged offense'") (quoting *People v. Ewoldt*, 867 P.2d 757 (Cal. 1994)).

12          Second, evidence of each count was strong.  The 7-Eleven robbery was recorded on

13   a videotape that clearly showed petitioner's face, bolstering a relatively weak identification

14   by Stapert.  While there was no videotape of the two other robberies, the victims of the

15   robberies positively identified petitioner.  There does not appear to be one stronger count or

16   a weaker count being influenced by the other counts.  The weight of the evidence of each

17   count appears to be roughly equal.  Because the evidence was cross-admissible and the

18   weight of the evidence was roughly equal, petitioner fails to demonstrate prejudice and

19   there was no violation of due process in the trial court's denial of severance.  *See Davis*,

20   384 F.3d at 638-39 (denial of motion to sever trial of charges based on separate incidents

21   not a violation of due process because evidence was cross-admissible, the weight of

22   evidence with respect to each incident was roughly equal, the evidence as to each incident

23   was distinct, and the jury was properly instructed); *Sandoval v. Calderon*, 241 F.3d 765,

24   773 (9th Cir. 2000) (given the strength of the State's case against petitioner on both sets of

25   murders and the cross-admissibility of the evidence on each set, petitioner's trial was not

26   actually prejudiced by the joinder).

27   ///

28          The state court's decision was not contrary to, or an unreasonable application of,

16

1   clearly established Supreme Court precedent; and it was not based on an unreasonable

2   determination of the facts.  *See* 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal

3   habeas relief on this claim.

4   **V.    Alternative restraints**

5       Petitioner claims that his due process rights were violated by the trial court's denial

6   of his request to wear a less-visible "stun belt" as an alternative to handcuffs and leg

7   shackles.

8       The California Court of Appeal summarized petitioner's motions for alternative

9   restraints:

10      After his *Faretta* request for self-representation had been granted and prior to
        the commencement of jury selection, [petitioner] moved to appear without
11      physical restraints.  At the January 22, 2002 hearing on the motion, [petitioner]
        argued that the shackles impaired his ability to represent himself, limited his
12      freedom of movement, and were being employed based on disciplinary matters
        in jail and not because of any misconduct in court.  The prosecutor objected,
13      contending that [petitioner's] disciplinary history in jail was relevant and that there
        were also incidents in the courtroom, both of which created a manifest need to
14      keep [petitioner] shackled.

15      The court reviewed [petitioner's] previous threats against defense counsel, the
        court, jail deputies, and even prospective jurors.  The court also reviewed
16      [petitioner's] threats against other inmates, and examined an ink pen that
        [petitioner] had brought into the courtroom.  The pen had been altered to be
17      used as a stabbing instrument.  The court denied [petitioner's] motion, finding
        [petitioner] was "clearly a danger" to everyone in the courtroom.  [Petitioner]
18      denied making any explicit threats to defense counsel, claiming that he had only
        told defense counsel "you will be seen."  [Petitioner] similarly denied the
19      allegations in the jail reports.

20      On January 24, 2002, [petitioner] made an oral motion to be restrained with
        something other than handcuffs.  [Petitioner] complained that the restraints
21      hindered his efforts in his defense because the jury was able to see the
        restraints, and the restraints had limited his ability to write and pick up papers.
22      The court indicated that [petitioner's] only alternative was "the electronic vest,"
        which "throws about 10,000 volts to your body."  The court preferred not to use
23      the electronic vest because of the possibility of accidents.  [Petitioner] then
        suggested a "boot" as an alternate means of restraint.  He had heard about the
24      "boot," a restraint that is placed on a [petitioner's] leg, from a deputy, but did not
        know exactly how it worked.  The court was unfamiliar with that type of restraint
25      but stated it would look into it. When [petitioner] again complained that the
        restraints made it difficult to reach things with his hands, the court inquired
26      whether there was anything at counsel's table that [petitioner] was unable to
        reach, and noted that there is a difference between having to strain to reach an
27      object and being unable to reach it.  The court denied the motion for alternative
        restraints.

28

United States District Court
For the Northern District of California

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Following the court's denial of the motion, [petitioner] told the court "this is bullshit." [Petitioner] loudly and angrily yelled at the court in a profanity-laced diatribe, which resulted in his exclusion from the courtroom.  That same day, the court received a report that [petitioner] had threatened to spit on the person who made the cell assignments at the courthouse.  The court found that this threat showed a "manifest need" to maintain restraints.

On January 31, 2002, the court received a report that [petitioner] had threatened to crush a deputy's windpipe.  [Petitioner] denied making any threats, claiming that the deputy had actually threatened him.  The court also reviewed reports from the California Department of Corrections, which noted that in 1997 [petitioner] was found in possession of a "plastic inmate-manufactured weapon," and that in 1991 he physically assaulted a prison guard.

The court then ordered the continuing use of the existing restraints, stating that "given your conduct, given your outburst in court, given your most recent threats against the Sheriff's Deputy . . . and the reports in the '80s from California Department of Corrections, now I have these from the '90s and your exposure. How can I not consider you to be *really dangerous in court*?  You will be endangering Sheriff's deputies, [the prosecutor], my staff, and myself . . . We found a makeshift weapon on you." (Italics added.)

[Petitioner] claimed that he had been carrying the pen in his shirt pocket and would never have done so if he intended to use it as a weapon, and that he had wrapped some tape around the pen to provide stability.  The court acknowledged that "if it was just by itself, I would understand possibly that as an innocent situation."  However, the court indicated that in light of disciplinary reports, prior threats, and prior weapon use, there was "far more than a manifest need that I have to consider; just on a street common sense, I have to consider you to be *very dangerous in court* . . . ." (Italics added.)  The court ordered that [petitioner] not only be restrained but that the restraints be bolted to the floor to restrict his movements.  The court also noted its intention to advise and instruct the jury concerning the restraints.

[Petitioner] again asked for an alternate type of restraint that would allow him to get his paperwork and write comfortably.  The court noted for the record that [petitioner] had "sufficient movement at [counsel's] table to reach everything that you have in front of you." He was able to reach his papers, his files, and his stack of juror questionnaires.  When the court asked [petitioner] what type of alternate restraint he wanted, [petitioner] asked for an electronic vest or belt. The court informed [petitioner] that it had used the electronic belt in the past and was not comfortable with it for two reasons.  [F/n 23.    Previously the court referred to an electronic vest.  It appears that the court interchangeably referred to an electronic vest and an electronic belt.]  First, there is a delay before the electronic charge reaches the person wearing the vest.  Second, there is a risk of an accidental pressing of the button.  Since there was a danger to [petitioner] and a continuing danger to the court staff, the court refused [petitioner's] request to wear an electronic belt.  The court invited other suggestions from [petitioner], and repeated its intention to admonish the jury about [petitioner's] restraints.

During voir dire, a prospective juror noted that [petitioner] was chained to the floor and compared him to Hannibal Lector.  The prospective juror indicated that the shackling made it "very difficult" to "impossible" for him to presume [petitioner] innocent.  Near the conclusion of jury selection the prospective jurors were polled on the issue; no juror indicated that he or she would be prejudiced

United States District Court

For the Northern District of California

1    against [petitioner] because of his restraints.

2    After the jury was selected and counsel reappointed, the defense moved for a
     mistrial based on the use of shackles during voir dire. Defense counsel noted
3    that [petitioner] had requested alternative restraints and contended that the stun
     belt or a "boot" would be suitable alternatives.  The court reiterated that there
4    was a "manifest need" for the restraints, while acknowledging that it was
     "obvious" to the jury that [petitioner] was restrained and that the restraints could
5    not be hidden from the jury.  The court noted that it had admonished the jury
     about [petitioner's] restraints and would continue to do so.  The court also
6    indicated that it had ordered the construction of a partition underneath counsel's
     table that would limit the visibility of the shackles. The court disputed defense
7    counsel's claim that [petitioner] had "volunteered" to wear a stun belt, stating that
     [petitioner] had only requested alternative restraints. The court further noted that
8    [petitioner's] limited range of motion did not affect the jury selection process,
     remarking that there was no need to present evidence or move around.
9    [Petitioner] was able to ask his questions directly to the jury panel without any
     limitations.

10
     The court denied the motion, again noting the problems with the stun belt.
11   Defense counsel then repeated [petitioner's] request for an alternative restraint,
     such as the electronic belt or the "boot," that would allow [petitioner] to stand up
12   and have one or both arms free. [F/n 24. Counsel did not know how the "boot"
     worked or even if it was available in Alameda County.] The prosecutor reminded
13   the court that [petitioner] had brought a weapon into the courtroom, and argued
     that allowing [petitioner] a free arm would put courtroom staff and counsel in
14   danger.  The court concluded there was a "manifest need" to have [petitioner's]
     arms restrained, and that it would be "completely irresponsible" to lessen
15   [petitioner's] restraints.

16   Ex. 3 at 33-37.

17          In the presence of the jury, a criminal defendant is ordinarily entitled to be free of

18   shackles or other restraints.  *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999)

19   ("*Rhoden II*"); *Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989).  Before a court may

20   order the use of physical restraints on a defendant at trial, the court must be persuaded by

21   compelling circumstances that some measure is needed to maintain the security of the

22   courtroom, and the court must pursue less restrictive alternatives before imposing physical

23   restraints.  *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995);  *Jones v. Meyers*, 899

24   F.2d 883, 885 (9th Cir. 1990); *Spain*, 883 F.2d at 720-21.  In all cases in which shackling

25   has been approved, there has been evidence of disruptive courtroom behavior, attempts to

26   escape from custody, assaults or attempted assaults while in custody, or a pattern of

27   defiant behavior.  *Duckett*, 67 F.3d at 749.

28          The trial court conducted several inquiries into whether petitioner needed to be

                                                    19

1    restrained and found compelling reasons for restraints.  It reviewed a possible inmate-

2    manufactured weapon he brought into court.  Ex. 2 at 377-78.  It reviewed threats petitioner

3    made in court against his counsel, the court, and the jury.  *Id.* at 375-77, 389.  It reviewed

4    his history of threats against deputies while in custody.  *Id.* at 379-84.  It received

5    information about threats petitioner continued to make, including a threat to spit on the

6    courthouse staff member who made cell assignments, *id.* at 500, and a threat to crush a

7    deputy's windpipe, *id.* at 1025-26.  It witnessed petitioner's angry outburst after it denied

8    petitioner's motion to wear the electronic vest.  *Id.* at 506-509.  The court found many

9    reasons to consider petitioner dangerous to those in the courtroom and conclude that there

10   was a "manifest need" to restrain petitioner.  The court also attempted to ameliorate the

11   impact of the shackles by having general services construct a partition under the table that

12   restricted the visibility of the shackles.  *Id.* at 1230.

13        There was abundant evidence here of the need for shackling, so to whatever extent

14   petitioner may be trying to argue that he should not have been restrained at all, that

15   argument is clearly without merit.  His principal argument, however, is that less obtrusive

16   restraints should have been used.

17        The court also conducted a inquiry into the need for alternative restraints.  It found

18   that in his current restraints petitioner was able to reach his papers and write.  *Id.* at 504-

19   505.  It found that he was able to reach everything in front of him, including stacks of juror

20   questionnaires and his files.  *Id.* at 1035.

21        The court also had reason to find the electronic vest dangerous to both petitioner

22   and those present in the courtroom.  It expressed concern about the high voltage

23   discharged by the vest and the possibility for accidents, and gave an example of an

24   accidental discharge in another case.  *Id.* at 502, 1036.  It also stated concern for those in

25   the courtroom due to the three to seven-second delay between the pressing of the button

26   and the charge reaching the petitioner, and what physical harm he could inflict in that time.

27   *Id.* at 1231.

28        A trial court is not required to use an alternative restraint unless it is both "less

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1   onerous" and "no less beneficial." *United States v. Collins*, 109 F.3d 1413, 1418 (9th Cir.

2   1997) (quoting *Spain v. Rushen*, 883 F.2d 712, 728 (9th Cir.1989). The California Court of

3   Appeal found that the trial court property denied petitioner's motion because of the risk

4   presented by use of the electronic belt. Ex. 3 at 38. Because of the risk of delay or

5   accidental discharge, the belt would not secure safety in the courtroom as effectively as the

6   arm and leg restraints. *Id.* at 38. It thus was not "no less beneficial" than the restraints

7   used, and failure to use it was not a constitutional violation.

8       Furthermore, petitioner has not shown prejudice from use of the restraints. The

9   court repeatedly and extensively admonished the jury not to consider petitioner's restraints

10  in any way. *Id.* at 1229. Given that juries are presumed to follow their instructions, *Weeks*

11  *v. Angelone*, 528 U.S. 225, 234 (2000), petitioner has not shown that there was a

12  substantial or injurious effect or influence on the jury. *See Brecht v. Abrahamson*, 507 U.S.

13  619, 623 (1993) (prejudice standard for federal habeas cases).

14      Petitioner is not entitled to federal habeas relief on this claim.

15  **VI.   Suppression Hearing**

16      Petitioner claims that the trial court erred in permitting the prosecution to relitigate

17  the suppression of the lineup identification.

18      The law requires that a defendant who is arrested without a warrant be afforded
    a judicial review of probable cause to continue detaining him, within a reasonable
19  period of time. (*Gerstein v. Pugh* (1975) 420 U.S. 103) In *County of Riverside
    v. McLaughlin* (1991) 500 U.S. 44, the court determined that such judicial
20  reviews would generally be found to be sufficiently prompt if held within 48 hours
    of arrest. Defendant was arrested on August 6, 1999. Within 48 hours, a judge
21  reviewed the case and determined there was probable cause to detain him. A
    live lineup, which included defendant, was held on August 9, 1999. A complaint
22  in the original case was filed against defendant on August 18, 1999, charging
    him with five robberies, various weapon enhancements, and prior conviction
23  allegations. The forms documenting the judicial determination of probable
    cause were misfiled in the clerk's office and were not included in the court file of
24  the original case. At the conclusion of the preliminary hearing in the original
    case, defendant argued that the case should be dismissed because of the
25  apparent failure to provide a prompt review of probable cause. The magistrate
    denied this motion, but suppressed the positive identifications that occurred
26  during the lineup as a remedy for the violation of the so-called "48 hour rule." [
    FN7. Defendant was not released from custody as he had a parole hold.]
27  On March 17, 2000, an information was filed in superior court. Defendant was
    arraigned on these charges on March 20, 2000. On July 5, 2000, the misfiled
28  paperwork relating to the probable cause determination was located by the

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

district attorney's office.  A new complaint was filed on July 25, 2000, charging the same offenses as the original information, along with additional charges of three counts of a felon in possession of a firearm (Pen.Code, § 12021, subd. (a)(1)).  [FN8. As victims Ireland-Hooper and Gravely could not positively say that defendant possessed a firearm, only the felon in possession charge relating to the 7-Eleven robbery remained by the time the case went to trial.]  The original case was dismissed upon motion of the prosecution.  [FN9. The second case is the subject of this appeal.]

The defense sought to bind the prosecution to the earlier ruling suppressing evidence of the lineup, arguing that since the suppression was essentially a ruling that defendant's prolonged detention without a judicial review of probable cause was illegal, it fell within the ambit of section 1538.5, which sets forth certain requirements in order to seek review of a suppression order.  The court agreed and ruled that the prosecution was bound by the earlier suppression order, but only as to the charges that had been filed in the original case (not as to the felon in possession of a firearm charges).  During the subsequent preliminary hearing in the new case, defendant made a motion to suppress the identifications made at the lineup, under section 1538.5.  The court ultimately found that, although it did not agree with the earlier ruling by another judge, it was bound by his determination that the prosecution was bound by the suppression order in the original case.  The court also ruled that defendant did not waive the earlier suppression order by filing the new motion.  However, the court denied the suppression motion as to the new section 12021 charges.

The issue of the binding effect of the first suppression order arose twice more in the trial court.  When defendant filed a motion to dismiss pursuant to section 995, the ruling judge opined that while suppression of the lineup identifications was not a proper remedy for a violation of the 48-hour rule, the decision had been made and he declined to rule on whether it could be relitigated in the trial court.  He did find that the identifications made by the victims were sufficient standing alone, and were independent of the physical lineup.  Then, on January 14, 2002, prior to the commencement of trial, the prosecution requested to reopen the suppression issue and defendant responded by moving to bind them to the earlier suppression.  The court ruled that it was not bound by the suppression order in the original case and granted the prosecution motion.  After receiving evidence, the court found the lineups were not unduly suggestive and ruled that the lineup identification evidence was admissible at trial.

Ex. 3 at 6-8.

Petitioner contends that the state courts "erred" by permitting the suppression order to be relitigated when the prosecution failed to follow a procedure for obtaining review of certain suppression orders set out in section 1538.5(j) of the California Penal Code.  This is solely a state law claim and thus cannot be the basis for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas unavailable for violations of state law or for alleged error in the interpretation or application of state law).

**CONCLUSION**

22

United States District Court
For the Northern District of California

1    For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The

2    clerk shall close the file.

3        **IT IS SO ORDERED.**

4    Dated:  March 30, 2009.                    _____

5                                          PHYLLIS J. HAMILTON
                                        United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    G:\PRO-SE\PJH\HC.05\Spencer4338.RUL.wpd

28